[Cite as *State v. McClain*, 2020-Ohio-1436.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 5-19-19

    v.

NOLAN E. MCCLAIN,

                                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2018 CR 00434

**Judgment Affirmed**

Date of Decision: April 13, 2020

APPEARANCES:

    *William T. Cramer* for Appellant

    *Phillip A. Riegle* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Nolan E. McClain ("McClain"), appeals the June 6, 2019 judgment of sentence of the Hancock County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} The case arises from an October 26, 2018 incident in which McClain was a passenger in a taxi cab when the vehicle was pulled over in Findlay, Ohio for minor traffic violations. The vehicle was searched by the police who found a plastic bag containing cocaine in the map pocket on the back of the front passenger-side seat, immediately in front of the right-rear seat where McClain was seated.

{¶3} On November 6, 2018, the Hancock County Grand Jury indicted McClain on one count of possession of cocaine in violation of R.C. 2925.11(A), a third-degree felony. (Doc. No. 1). On November 7, 2018, McClain appeared for arraignment and entered a plea of not guilty. (Doc. No. 6).

{¶4} A jury trial was held on May 13-14, 2019. (Doc. No. 56). At the close of the State's case, McClain made a motion for acquittal under Crim.R. 29, which the trial court denied. (May 13-14, 2019 Tr., Vol. III, at 469-470). On May 14, 2019, the jury found McClain guilty. (Doc. Nos. 45, 56).

{¶5} On May 14, 2019, immediately following the jury trial, the trial court sentenced McClain to 30 months in prison. (Doc. No. 56). On June 6, 2019, the trial court filed its judgment entry of conviction and sentence. (*Id.*).

{¶6} On June 13, 2019, McClain filed a notice of appeal. (Doc. No. 57). He raises two assignments of error, which we will address together.

**Assignment of Error No. I**

**Appellant's right to due process under the state and federal constitutions was violated by a conviction for possession of cocaine that was not supported by sufficient evidence.**

**Assignment of Error No. II**

**Appellant's conviction for possession of cocaine was against the weight of the evidence.**

{¶7} In his assignments of error, McClain argues that his possession-of-cocaine conviction is based on insufficient evidence and against the manifest weight of the evidence.

{¶8} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard "[o]nly in exceptional cases, where the evidence 'weighs heavily against the

-4-

conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{**¶11**} At trial, the State offered the testimony of F. Scott Rothlisberger ("Rothlisberger"), a taxicab driver for Trinity Cab in Findlay, Ohio. (May 13-14, 2019 Tr., Vol. II, at 263, 265-266). Rothlisberger testified that he was working a 7:00 p.m. to 7:00 a.m. shift on October 25-26, 2018. (*Id.* at 266). As part of his job, Rothlisberger kept a log of his fares. (*Id.* at 267). He identified State's Exhibit 1 as a composite of two pages of photographs, including several photos of the log from his shift on October 25-26, 2018. (*Id.* at 275-276). (*See* State's Ex. 1). Rothlisberger testified that he had a total of six taxi fares that evening, including McClain, who was his final fare of the shift. (May 13-14, 2019 Tr., Vol. II, at 276-278).

{**¶12**} Rothlisberger testified that his first fare of the evening occurred at 10 p.m. when he drove a regular customer to work. (*Id.* at 278-279). Rothlisberger stated that the customer called him back shortly after he dropped her off to inform him that she lost her cell phone and asked him to search his taxi for the missing phone. (*Id.* at 279). Rothlisberger testified that he pulled over his cab on Pearl Street and searched the entire vehicle, including the map pocket attached to the back of the front passenger seat. (*Id.* at 279-280). According to Rothlisberger, during

his search he did not locate either the first passenger's cell phone or anything that looked like it could be illegal drugs. (*Id.* at 280).

{¶13} Rothlisberger's second fare was a single passenger that Rothlisberger drove to a bar in downtown Findlay. (*Id.* at 281). The customer sat in the front seat and Rothlisberger testified that he did not observe the customer access the map pocket behind the passenger seat. (*Id.*). Rothlisberger's third customer was a regular passenger that Rothlisberger drove home from work nearly every weekday. (*Id.* at 282). Rothlisberger testified that the passenger sat in the front passenger seat, and he did not observe the passenger access the pocket behind the passenger seat. (*Id.*).

{¶14} The fourth fare of the evening was two regular customers that Rothlisberger drove home from work several times a week. (*Id.* at 283). Rothlisberger testified that one passenger sat in the front passenger seat and the other passenger sat in the back seat on the passenger side. (*Id.* at 283-284). Rothlisberger stated that he regularly picks up the two passengers from work and drives them home. (*Id.* at 284). He further stated that he has never had any problems with these passengers. (*Id.*). Rothlisberger's fifth fare of the evening was a regular customer that he drove from work to Grace Boulevard. (*Id.* at 285). The single passenger sat in the front passenger seat, and Rothlisberger testified that he did not

observe the customer get in the back or access the pocket on the back of the passenger seat. (*Id.* at 285-286).

{¶15} Finally, Rothlisberger received a call from McClain requesting to be picked up from the 300-block of Clinton Street in Findlay, Ohio. (*Id.* at 267-268). Rothlisberger stated that when he pulled up to the residence to pick up McClain, he observed a police officer drive past the taxi. (*Id.* at 268-269). Rothlisberger then observed the officer make a turn and drive down an alley next to the taxi's location. (*Id.* at 269). Rothlisberger identified McClain as the customer that he picked up on Clinton Street. (*Id.* at 269-271). Rothlisberger stated that McClain sat down in the right rear seat, directly behind the front passenger seat. (*Id.* at 271). Rothlisberger testified that McClain requested that he drive him to the 500-block of Allen Street in Findlay, Ohio. (*Id.*). Rothlisberger testified that he began to drive in the direction of Allen Street; however, shortly thereafter, a police officer initiated a traffic stop of the taxi. (*Id.* at 271-272).

{¶16} Rothlisberger stated that the police officer indicated that the vehicle was stopped for a potential moving violation. (*Id.* at 273-274). Rothlisberger testified that after he and McClain gave the police officer their identifications, the officer requested that Rothlisberger get out of the taxi. (*Id.* at 272). Rothlisberger stated that he and the police officer stood behind the police vehicle and spoke about his taxi fares that evening, including how many people had been in the vehicle. (*Id.*

at 272-273). Rothlisberger also told the officer that he searched the vehicle earlier in the evening after his first passenger lost her phone. (*Id.* at 273, 278-279). Rothlisberger also shared his log from the evening with the officer. (*Id.* at 274). Rothlisberger stated that he gave the police officer permission to search the taxi. (*Id.* at 288-289).

{¶17} Rothlisberger identified several other photos in State's Exhibit 1 as photos of his taxi and a photo of the substance the officers removed from the vehicle. (*Id.* at 287-288). (*See* State's Ex. 1). Rothlisberger denied seeing the substance in the vehicle prior to McClain entering the vehicle. (May 13-14, 2019 Tr., Vol. II, at 288).

{¶18} Rothlisberger described his taxi as a red Nissan van. (*Id.* at 287, 289). Rothlisberger stated that there are several cab companies that operate in Findlay and one other company may also drive vans. (*Id.* at 289).

{¶19} On cross-examination, Rothlisberger admitted that the map pocket on the back of the front passenger seat is accessible to anyone in the vehicle. (*Id.* at 292). He also acknowledged that because he was driving and watching the road, it was possible that the map pocket behind the front passenger seat could be accessed without his knowledge. (*Id.* at 295). Rothlisberger further stated that he conducted his search of the vehicle on a side street, rather than somewhere well-lit. (*Id.* at

293). Rothlisberger also testified that when he conducted his search of the vehicle, he was specifically searching for a cell phone, rather than drugs. (*Id.* at 292-293).

{¶20} The State next offered the testimony of Officer Brooks Deidrick ("Officer Deidrick"), a police officer with the Findlay Police Department. (*Id.* at 300). Officer Deidrick testified that he was working the overnight shift on October 25-26, 2018 when he received information from a resident living in the 100-block of Woodley Terrace that the resident believed there was drug activity occurring at a specific residence in the neighborhood. (*Id.* at 301-302). The informant stated that throughout the evening he observed a red or black-colored taxi van make numerous stops at the house in question and each time the vehicle came or went, it either dropped off or picked up a black male. (*Id.* at 302).

{¶21} Officer Deidrick testified that after he received the information, he patrolled the area, but he did not locate the vehicle the informant described. (*Id.* at 303). However, Officer Deidrick stated that he sent an electronic message to every other on-duty officer with the Findlay Police Department via the department's mass announcement system detailing all the information he received from the citizen. (*Id.* at 303-304).

{¶22} The State's next witness was Officer Dillon Kliesch ("Officer Kliesch"), a patrol officer with the Findlay Police Department. (*Id.* at 316-317). Officer Kliesch testified that he was working the overnight shift on October 25-26,

2018 when he assisted Officer Ryan Hackworth ("Officer Hackworth") with a traffic stop. (*Id.* at 320). Officer Kliesch testified that when he arrived at the scene, Officer Hackworth had already stopped the taxi vehicle. (*Id.* at 321). Officer Kliesch stated that, for officer safety purposes, he stood at the rear passenger side door and observed the passenger. (*Id.*). He testified that he was specifically watching for furtive movements, such as those associated with weapons. (*Id.*).

{¶23} Officer Kliesch stated that although it was dark outside and the windows on the taxi were tinted, he was able to see some of what was going on inside the vehicle. (*Id.* at 322). Officer Kliesch identified McClain as the individual he was monitoring in the back seat of the vehicle. (*Id.* at 325-326). Officer Kliesch testified that he observed McClain, who was seated in the right rear seat, lean forward toward the back of the front passenger seat. (*Id.* at 327). However, Officer Kliesch was unable to see anything McClain did with his hands. (*Id.*).

{¶24} While Officer Kliesch was observing McClain, Officer Hackworth was talking to the taxi driver outside of the vehicle. (*Id.* at 327-328). Officer Kliesch stated that he overheard Officer Hackworth ask the taxi driver where he was dropping off McClain, to which the taxi driver indicated he was traveling to 527 Allen Street. (*Id.* at 323). Officer Kliesch stated that through the course of his employment with the Findlay Police Department, he knew that a search warrant was

issued just a few days prior for that address for suspected narcotics. (*Id.* at 324-325).

{¶25} Officer Kliesch testified that after Officer Hackworth finished speaking to the taxi driver, Officer Kliesch relayed his observations regarding McClain's movements to Office Hackworth. (*Id.* at 327-328). Officer Kliesch stated that he assisted Officer Hackworth in searching the vehicle, but he did not find any contraband on the driver's side of the vehicle. (*Id.* at 329).

{¶26} On cross-examination, Officer Kliesch stated that he could not see McClain's hands and did not see McClain put anything in the pocket on the back of the passenger seat. (*Id.* at 332). He also did not see McClain's hands move. (*Id.*).

{¶27} However, on redirect examination, Officer Kliesch clarified that when he made the observations regarding McClain's movement, he was standing to the back of McClain's right shoulder. (*Id.* at 333). Officer Kliesch stated that his position allowed him to observe McClain without letting McClain know he was there. (*Id.*). Officer Kliesch further testified that he felt that it was important to inform Officer Hackworth of his observations regarding McClain's movements because in his background, training, and experience, he recognized McClain's movements to be "nervous" or "furtive" movements. (*Id.* at 333-334). Officer Kliesch stated that he was particularly concerned about weapons at the time he made

the observation and that since he was unable to observe McClain's hands, the movement he observed "could have meant anything." (*Id.* at 334).

{¶28} On recross examination, Officer Kliesch again confirmed that he did not specifically see McClain put anything inside of the map pocket on the back of the front passenger seat. (*Id.* at 335). He also admitted that when the search of the taxi commenced, he did not alert Officer Hackworth to check the map pocket for contraband. (*Id.*). Officer Kliesch also stated that he had no way of being certain that the address that McClain was traveling to was 527 Allen Street. (*Id.* at 336-337).

{¶29} Next, the State offered the testimony of Officer Hackworth, a patrol officer with the Findlay Police Department who was working the overnight shift on October 25-26, 2018. (May 13-14, 2019 Tr., Vol. III, at 356-359). Officer Hackworth testified he read the electronic message sent out by Officer Deidrick alerting officers that a red or black taxicab was traveling to and from a residence in the Woodley Terrace area and was frequently dropping off or picking up a black male. (*Id.* at 359-360).

{¶30} Officer Hackworth testified that he was patrolling the 300-block of Clinton Street on a routine patrol when he observed a red taxi van pull up in front of a residence. (*Id.* at 360-361). Given that the information he received about the taxi van matched the description of the taxi van Officer Hackworth observed, he

directed his attention to the vehicle. (*Id.* at 361). Officer Hackworth testified that he first observed the taxi as it stopped at a residence at 325 Clinton Street, and he decided to drive down an alley where he could inconspicuously observe the taxi. (*Id.* at 362). Officer Hackworth observed a black male, whom he identified as McClain, exit the residence at 325 Clinton Street and enter the right rear sliding door of the taxi van. (*Id.* at 362-363). Officer Hackworth then followed the taxi for a short distance, during which he observed the taxi driver commit several minor traffic violations. (*Id.* at 363-365). As a result, Officer Hackworth initiated a traffic stop of the taxi. (*Id.* at 365).

{¶31} When the vehicle came to a stop, Officer Hackworth identified the driver as Rothlisberger and the passenger as McClain through their driver's licenses and identification cards. (*Id.* at 367-369, 374). Officer Hackworth spoke to Rothlisberger about where he was coming from and where he was going. (*Id.* at 369). Officer Hackworth confirmed Officer Kliesch's testimony that Officer Kliesch arrived to observe and help Officer Hackworth secure the scene. (*Id.* at 367-368).

{¶32} As Officer Kliesch observed McClain in the back of the van, Officer Hackworth communicated with dispatch and received information that McClain had an active warrant for his arrest. (*Id.* at 374-375). Consequently, McClain was handcuffed and taken into custody. (*Id.* at 376).

{¶33} Officer Hackworth spoke to Rothlisberger, who gave Officer Hackworth permission to search the taxi. (*Id.* at 372-373). During the search of the vehicle, Officer Hackworth found a substance that he suspected to be cocaine located in the map pocket on the back of the front passenger seat. (*Id.* at 377, 379-380). Officer Hackworth conducted a field test on the substance and received a presumptive positive result for cocaine. (*Id.* at 389-391).

{¶34} Officer Hackworth identified State's Exhibit 1 as a two-page composite of digital photographs that he took at the scene. (*Id.* at 378-379). (*See* State's Ex. 1). The photographs include a photo of the suspected cocaine in the map pocket attached to the back of the front passenger seat. (May 13-14, 2019 Tr., Vol. III, at 379-381); (State's Ex. 1). State's Exhibit 1 also includes a photograph of the taxi van with the right rear sliding door open. (May 13-14, 2019 Tr., Vol. III, at 381). (*See* State's Ex. 1). The photograph depicts the right rear seat immediately behind the passenger seat, the seat in which McClain was seated, reclined back. (May 13-14, 2019 Tr., Vol. III, at 381); (State's Ex. 1). Officer Hackworth stated the seat position was significant because the furtive movement that Officer Kliesch observed would have been more prominent because McClain would have actually had to come up out of the seat to lean forward. (May 13-14, 2019 Tr., Vol. III, at 381-382).

{¶35} Officer Hackworth testified that he discussed with Rothlisberger his customers during that evening's shift and learned that Rothlisberger searched his van earlier in the evening while searching for a previous customer's lost cell phone. (*Id.* at 383-385). Officer Hackworth stated that he reviewed Rothlisberger's log book and took photographs of the log. (*Id.* at 386). Officer Hackworth identified photographs of the log as part of State's Exhibit 1. (*Id.*). (*See* State's Ex. 1). Officer Hackworth also learned from Rothlisberger that his other customers during the evening were mostly regular fares and that every customer, except for McClain and one other passenger, sat in the front passenger seat. (May 13-14, 2019 Tr., Vol. III, at 384-385).

{¶36} Officer Hackworth clarified that he was not asserting that Rothlisberger's taxi was connected to the information the police received regarding suspicious activity at Woodley Terrace. (*Id.* at 388-389). Officer Hackworth also identified State's Exhibit 2 as the suspected cocaine that was collected from the map pocket attached to the back of the front passenger seat in the taxi. (*Id.* at 393-399). (*See* State's Ex. 2).

{¶37} On cross-examination, Officer Hackworth stated that in his experience as a police officer, he has encountered many situations where contraband or a weapon was found in a vehicle but not on an occupant's person. (May 13-14, 2019 Tr., Vol. III, at 403). Officer Hackworth also admitted that the sole reason that he

was alerted to the taxi on Clinton Street was because of the information that he received regarding a red taxi possibly being involved in drug activity. (*Id.* at 409-410). Officer Hackworth further stated that the police will sometimes identify possible drug houses by seeing vehicles drive up to the house at all hours of the day. (*Id.* at 412). Hackworth admitted that Rothlisberger was not treated with suspicion. (*Id.* at 413).

{¶38} Finally, the State presented the testimony of Samuel Fortener ("Fortener"), a forensic scientist with the Bureau of Criminal Investigation. (*Id.* at 418). Fortener testified that his job responsibilities include testing controlled substances, including cocaine. (*Id.* at 419, 422). Fortener testified that he weighed the substance identified as State's Exhibit 2 and performed a color-analysis test and an instrumental-analysis test using a gas chromatograph mass spectrometer on the substance. (*Id.* at 426-430). Fortener stated that based on the testing he performed and his training and experience, he was able to determine that the white substance contained in State's Exhibit 2 was 15.39 grams of cocaine. (*Id.* at 438-439). (*See* State's Ex. 2). Fortener's conclusions were also contained in State's Exhibit 3, which he identified as a copy of the laboratory report that he generated for the substance contained in State's Exhibit 2. (May 13-14, 2019 Tr., Vol. III, at 425); (State's Ex. 3). (*See* State's Ex. 2). On cross-examination, Fortener stated that

fingerprinting analysis and DNA testing was not performed on State's Exhibit 2. (May 13-14, 2019 Tr., Vol. III, at 439-440).

{¶39} Following Fortener's testimony, the State's exhibits were admitted without objection. (*Id.* at 448-450). Thereafter, the State rested. (*Id.* at 468). McClain then made a Crim.R. 29 motion for acquittal, which the trial court denied. (*Id.* at 469-470).

{¶40} Next, Bobby Walker, Jr. ("Walker"), an acquaintance of McClain, testified on McClain's behalf. (*Id.* at 471-473). Walker stated that he lives at 501 Allen Street in Findlay, Ohio. (*Id.* at 472, 474). He stated that on or around October 26, 2018, McClain was supposed to come to his house. (*Id.* at 473). However, McClain did not arrive, and Walker read in the paper the following day that McClain had been arrested. (*Id.* at 473-474).

{¶41} Thereafter, McClain rested. (*Id.* at 476). The State did not present any additional witnesses on rebuttal. (*Id.* at 476). The matter was submitted to the jury, which found McClain guilty as to the count in the indictment and further found that the cocaine was in an amount that equals or exceeds ten grams but is less than 20 grams. (*Id.* at 540, 543-544).

{¶42} We first review the sufficiency of the evidence supporting McClain's possession-of-cocaine conviction. *State v. Velez*, 3d Dist. Putnam No. 12-13-10,

2014-Ohio-1788, ¶ 68, citing *State v. Wimmer*, 3d Dist. Marion No. 9-98-46, 1999 WL 3551590, *1 (Mar. 26, 1999).

{¶43} McClain was convicted of possessing cocaine under R.C. 2925.11(A), which provides, "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." On appeal, McClain argues only that there is insufficient evidence that he *possessed* the cocaine. Because possession is the only element McClain challenges on appeal, our review will be limited to determining whether sufficient evidence was presented that McClain possessed the cocaine. *Compare State v. Watts*, 3d Dist. Hancock No. 5-12-34, 2016-Ohio-257, ¶ 43.

{¶44} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "The issue of whether a person charged with drug possession knowingly possessed a controlled substance 'is to be determined from all the attendant facts and circumstances available.'" *State v. Brooks*, 3d Dist. Hancock No. 5-11-11, 2012-Ohio-5235, ¶ 45, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

{¶45} "Possession of drugs can be either actual or constructive." *State v. Bustamante*, 3d Dist. Seneca Nos. 13-12-26 and 13-13-04, 2013-Ohio-4975, ¶ 25,

citing *State v. Cooper*, 3d Dist. Marion No. 9-06-49, 2007-Ohio-4937, ¶ 25, citing *State v. Wolery*, 46 Ohio St.2d 316, 329 (1976) and *State v. Haynes*, 25 Ohio St.2d 264 (1971). "'A person has "actual possession" of an item if the item is within his immediate physical possession.'" *Id.*, quoting *State v. Williams*, 4th Dist. Ross No. 03CA2736, 2004-Ohio-1130, ¶ 23. "A person has 'constructive possession' if he is able to exercise dominion and control over an item, even if the individual does not have immediate physical possession of it." *Id.*, citing *State v. Hankerson*, 70 Ohio St.2d 87 (1982), syllabus and *Wolery* at 329. "For constructive possession to exist, '[i]t must also be shown that the person was conscious of the presence of the object.'" *Id.*, quoting *Hankerson* at 91. "Finally, the State may prove the existence of the various elements of constructive possession of contraband by circumstantial evidence alone." *Id.*, citing *State v. Stewart*, 3d Dist. Seneca No. 13-08-18, 2009-Ohio-3411, ¶ 51. *See also Jenks*, 61 Ohio St.3d at 272-73. "Absent a defendant's admission, the surrounding facts and circumstances, including the defendant's actions, are evidence that the trier of fact can consider in determining whether the defendant had constructive possession." *State v. Voll*, 3d Dist. Union No. 14-12-04, 2012-Ohio-3900, ¶ 19, citing *State v. Norman*, 10th Dist. Franklin No. 03AP-298, 2003-Ohio-7038, ¶ 31 and *State v. Baker*, 10th Dist. Franklin No. 02AP-627, 2003-Ohio-633, ¶ 23.

{¶46} "Although a defendant's mere proximity to drugs is in itself insufficient to establish constructive possession, proximity to the drugs may constitute some evidence of constructive possession." *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 20, citing *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 40. "Therefore, presence in the vicinity of contraband, coupled with another factor or factors probative of dominion or control over the contraband, may establish constructive possession." *Id.*, citing *State v. Riggs*, 4th Dist. Washington No. 98CA39, 1999 WL 727952, *5 (Sept. 13, 1999). "[F]urtive movements in an automobile may provide sufficient indicia of dominion or control over contraband, allowing an inference of constructive possession." *Id.*, citing *Riggs* at *5.

{¶47} Here, the State presented evidence that, when viewed in a light most favorable to the State, could lead a rational trier of fact to find that McClain had constructive possession of the drugs in the vehicle. McClain was sitting in the seat directly behind the front passenger seat immediately before the vehicle was searched and the cocaine was located in the map pocket on the back of the front passenger seat. Moreover, the State presented evidence that the drugs found in the map pocket were within easy reach of McClain, who was sitting in the seat directly behind the front passenger seat, and were therefore in an area immediately assessable to McClain during the trip. The State also presented evidence that McClain was one

of only two individuals who sat in that seat over the course of the evening. Additionally, Officer Kliesch testified that he observed McClain lean forward toward the map pocket and make furtive movements. This evidence, when viewed in a light most favorable to the State, could allow the jury to infer that McClain exercised dominion and control over the cocaine. *See State v. Davis*, 3d Dist. Allen Nos. 1-17-44 and 1-17-45, 2018-Ohio-4368, ¶ 52 (holding that the location of the drugs in the immediate proximity of appellant's position in the vehicle constituted some evidence of constructive possession and that appellant's "furtive movements in the area where the cocaine was located is indicative of knowledge and possession"); *State v. Tackett*, 11th Dist. Ashtabula No. 2018-A-0052, 2019-Ohio-5188, ¶ 42 (finding that sufficient evidence was presented to create an inference of constructive possession of methamphetamine where the drugs were found in an area readily accessible and in close proximity to the defendant and the defendant was observed "twisting and turning in her seat" prior to the vehicle's stop).

{¶48} Nevertheless, McClain argues that because there were other people in the taxi that night who could have placed drugs in the map pocket, including at least one passenger who rode in the same rear seat as McClain, the State did not present sufficient evidence for the jury to determine that he had possession of the cocaine found in the vehicle. We reject this argument. First, if the State relies on circumstantial evidence to prove an essential element of an offense, it is not

necessary for "such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *Jenks*, 61 Ohio St.3d, at paragraph one of the syllabus. "Circumstantial evidence and direct evidence inherently possess the same probative value[.]" *Id.* Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that i[t] weigh *all* of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." (Emphasis sic.) *Id.* at 272, citing *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir.1969). Here, Rothlisberger testified that he did not observe any of the other passengers access the map pocket. With respect to the other passenger who sat in the same seat earlier in the evening, Rothlisberger specifically testified that he did not observe the passenger access the map pocket. Moreover, the passenger was a regular customer that Rothlisberger picked up directly from his place of employment at the conclusion of his shift and drove him directly home. Rothlisberger also stated that he never had any problems with the regular customer in the past. No one, other than the customer who lost her phone, contacted Rothlisberger or indicated that they left an item in the vehicle. Finally, Officer Kliesch testified that he observed McClain lean forward in a "furtive movement."

{¶49} McClain also argues that the State failed to present sufficient evidence for a jury to determine that he had possession of the cocaine because no fingerprint

or DNA testing was performed on the bag. We disagree. Although forensic evidence of McClain's fingerprints or DNA on the bag would be direct evidence that McClain touched the bag, the State presented other evidence which, as detailed above, was sufficient for the jury to establish that McClain possessed the cocaine.

{¶50} We similarly reject McClain's argument that the State did not present sufficient evidence upon which a rational trier of fact could determine that he had possession of the cocaine because "there was no evidence linking McClain to a drug house." (Appellant's Brief at 7). Although the State has the burden of proving each of the elements of the offense, the State is not required to prove that McClain was coming from or going to a drug house, as that is not an element of the offense of possession of cocaine.

{¶51} Therefore, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State proved that McClain possessed the cocaine. Accordingly, we conclude that McClain's possession-of-cocaine conviction is supported by sufficient evidence.

{¶52} Having concluded that McClain's possession-of-cocaine conviction is based on sufficient evidence, we next address McClain's argument that his conviction is against the manifest weight of the evidence. *See Velez,* 2014-Ohio-1788, at ¶ 76.

**{¶53}** In support of his argument that his conviction is against the manifest weight of the evidence, McClain summarily relies on the same arguments that he raised in his first assignment of error that we rejected above. (Appellant's Brief at 8). As McClain has failed to argue specifically how his conviction is against the manifest weight of the evidence, we decline to root out any possible argument for him.

**{¶54}** Here, the jury could reasonably infer from the evidence presented at trial that McClain exercised dominion and control over the cocaine. "A jury can make reasonable inferences from the evidence." *State v. Knight*, 10th Dist. Franklin Nos. 16AP-288 and 16AP-290, 2016-Ohio-8134, ¶ 26. "'The weight given to an inference is a question for the trier of fact and will not be disturbed unless it is such that reasonable minds could not reach such a conclusion.'" *Id.*, quoting *State v. Sanders*, 6th Dist. Lucas No. L-96-379, 1998 WL 78787, *3 (Feb. 13, 1998), citing *State v. Palmer*, 80 Ohio St.3d 543 (1997), paragraph four of the syllabus. As discussed in the sufficiency-of-the-evidence analysis, McClain was seated in the rear passenger-side seat, with immediate access to the map pocket. Moreover, he was the only passenger in the vehicle at the time of the traffic stop. Additionally, only one other passenger sat in the back seat of the vehicle that evening, and the other passenger was a regular customer that Rothlisberger drove from work directly to a residence. Officer Kliesch also testified that he observed McClain lean forward

in his seat in what Officer Kliesch described as a "furtive movement." Based on that evidence, we cannot say that the jury lost its way in concluding that McClain exercised dominion and control over the cocaine. Thus, McClain's possession-of-cocaine conviction is not against the manifest weight of the evidence.

{¶55} Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that the jury did not clearly lose its way and create such a manifest miscarriage of justice that McClain's conviction must be reversed. Accordingly, McClain's conviction is not against the manifest weight of the evidence.

{¶56} Accordingly, McClain's first and second assignments of error are overruled.

{¶57} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW P.J. and ZIMMERMAN J., concur.**

**/jlr**